UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PROPEX, INC.; | ) | Bankruptcy Case No. 08-10249 |
| PROPEX HOLDINGS, INC.; | ) | Bankruptcy Case No. 08-10250 |
| PROPEX CONCRETE SYSTEMS | ) | |
| CORPORATION; | ) | Bankruptcy Case No. 08-10252 |
| PROPEX FABRICS INTERNATIONAL | ) | |
| HOLDINGS I, INC.; and | ) | Bankruptcy Case No. 08-10253 |
| PROPEX FABRICS INTERNATIONAL | ) | |
| HOLDINGS II, INC., | ) | Bankruptcy Case No. 08-10254 |
| | ) | |
| Debtors. | ) | Chapter 11 |
| | ) | Jointly Administered Under |
| | ) | Bankruptcy Case No. 08-10249 |

_____

| | | |
|---|---|---|
| BNP PARIBAS, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | Case No. 1:09-cv-145 |
| | ) | |
| PROPEX, INC., et al., | ) | |
| | ) | |
| Appellees. | ) | |

_____

| | | |
|---|---|---|
| BLACK DIAMOND CAPITAL | ) | |
| MANAGEMENT, LLC, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | Case No. 1:09-cv-147 |
| | ) | |
| PROPEX, INC., et al., | ) | |
| | ) | |
| Appellees. | ) | |

## MEMORANDUM AND ORDER

1

These consolidated bankruptcy appeals brought pursuant to 28 U.S.C. § 158(a) involve common questions of law and fact. Appellants BNP Paribas ("BNP") and Black Diamond Capital Management ("Black Diamond") raise the same issues and arguments.

Appellees/Debtors Propex, Inc, Propex Holdings, Inc., Propex Concrete Systems Corporation, Propex Fabrics International Holdings I, Inc., and Propex Fabrics International Holdings II, Inc., each a bankruptcy debtor-in-possession (collectively "Debtors"), made a motion in the Bankruptcy Court pursuant to 11 U.S.C. §§ 105, 363, and 364 seeking authorization to pay their 2009 debtor-in-possession loan ("2009 DIP Loan") from the net proceeds derived from the court-approved sale of substantially all of the Debtors' business assets to Purchaser Xerxes. BNP and Black Diamond raised objections.

Xerxes Operating Company, LLC and Xerxes Foreign Holdings Corporation (collectively "Xerxes") purchased the Debtors' assets through the auction and sale approved by the Bankruptcy Court. Xerxes Operating Company, LLC and Xerxes Foreign Holding Corporation are majority owned by Wayzata Opportunities Fund II, L.P., an affiliate of Wayzata Investment Partners, LLC. Wayzata Investment Partners, LLC ("Wayzata DIP Lender") provided the post-petition financing to the Debtors through the 2009 DIP Loan. Appellants BNP and Black Diamond refer to Xerxes as the "Wayzata Purchaser." To avoid confusion and provide clarity, this Court will refer to the Purchaser of the Debtors' assets as Xerxes and not as the Wayzata Purchaser.

On April 15, 2009, the Bankruptcy Court held an evidentiary hearing and heard oral argument on the Debtors' motion. The Bankruptcy Court denied the objections of BNP and Black Diamond. The Bankruptcy Court granted the Debtors' motion and ordered that from the net proceeds received at the closing of the sale of the Debtors' assets, following delivery of the assets

to Xerxes, the Debtors shall pay all obligations under the 2009 DIP Loan.

Black Diamond, a pre-petition lender and secured creditor, brings this appeal on behalf of itself and other funds it represents. BNP is acting as the administrative agent for the lender group under the Debtors' pre-petition senior credit facility. These consolidated appeals seek review of and relief from the DIP Payment Order entered by the Bankruptcy Court on April 15, 2009, approving the Debtors repayment of the 2009 DIP Loan from the proceeds of the sale of the Debtors' assets to Xerxes including the Debtors' cash on hand, i.e Acquired Cash.

Appellees/Debtors (Propex) move to dismiss the appeals. First, the Debtors argue that they (not Xerxes) should be dismissed as parties to these appeals for two reasons: (1) BNP and Black Diamond previously stipulated that they waive all claims against the Debtors; and (2) by these appeals BNP and Black Diamond cannot obtain any relief from the Debtors because the asset in dispute, the Debtors' Acquired Cash – cash on hand at the closing of the sale – has already been transferred to Xerxes and is no longer in the Debtors' possession.

In the alternative, the Debtors argue that these appeals should be dismissed in their entirety on four other grounds: (1) statutory mootness under 11 U.S.C. § 363(m); (2) equitable mootness; (3) the appeals are an impermissible collateral attack on the Bankruptcy Court's Sale Order approving the sale of the Debtors' assets to Xerxes; and (4) the Appellants failed to include and join a necessary party to these appeals, the Wayzata DIP Lender that was repaid on the 2009 DIP Loan. Appellee Xerxes joins in the motion to dismiss and adopts these four alternative arguments made by the Appellees/Debtors (Propex) to dismiss the appeals in their entirety.

Appellants BNP and Black Diamond oppose the motion to dismiss their appeals. After reviewing the record, the Court concludes that the motion by Appellees/Debtors (Propex) and

Appellee Xerxes to dismiss the consolidated appeals will be granted. Furthermore, the Court concludes that the decision rendered by the Bankruptcy Court on April 15, 2009, and the DIP Payment Order are correct and must be affirmed. The Bankruptcy Court has not committed an error of fact or law. These consolidated appeals will be dismissed.

## I.     Motion For Oral Argument

Appellant BNP moves for oral argument on the Appellees' motion to dismiss the appeals. Bankruptcy Rule 8012 provides that oral argument shall be allowed in all cases unless the District Judge determines after examination of the briefs and record that oral argument is not needed. Oral argument will not be allowed if the facts and legal arguments are adequately presented in the briefs and the record, and the decisional process would not be significantly aided by oral argument.

The motion for oral argument is **DENIED** under Bankruptcy Rule 8012. The facts and legal arguments are adequately presented in the briefs and the record. Oral argument is unnecessary and would not significantly aid this Court in deciding the motion to dismiss the appeals.

## II.     Facts

On January 18, 2008, the Debtors filed voluntary petitions for bankruptcy under Chapter 11 of the Bankruptcy Code. The Debtors owed a syndicate of lenders approximately $230,000,000 based on pre-petition extensions of credit. BNP is the agent for the lending syndicate and Black Diamond is one of the pre-petition secured lenders.

The Debtors continued to operate their businesses as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. On January 16, 2009, the Debtors made a motion seeking authorization from the Bankruptcy Court to obtain debtor-in-possession financing (2009 DIP Loan) from the Wayzata DIP Lender to replace a previous 2008 DIP Loan that was maturing. The Bankruptcy

Court granted the motion and ordered that the 2009 DIP Loan would mature and become due and payable no later than April 23, 2009, or earlier upon the closing of the sale of the Debtors' assets which secured the 2009 DIP Loan.

On February 17, 2009, the Debtors filed motions in the Bankruptcy Court seeking authorization to sell substantially all of their assets at auction pursuant to 11 U.S.C. § 363(b), and also seeking approval of bid procedures to be used in conjunction with the sale. As part of the bid procedures, the Debtors submitted to the Bankruptcy Court a proposed Asset Purchase Agreement ("APA") and "stalking horse" bid by Xerxes. The bid by Xerxes included the purchase of the Debtors' existing cash on hand. The Bankruptcy Court approved the auction bid procedures with Xerxes as the "stalking horse" bidder.

On March 23-24, 2009, the Debtors conducted the auction. Black Diamond was an active bidder along with Xerxes and a third bidder. At the conclusion of the auction, the Debtors determined that Xerxes had submitted the highest and best bid to purchase the Debtors' assets. Xerxes submitted a revised APA in connection with their final bid. The revised APA identified the assets that Xerxes would acquire and one of the assets was the Debtor's Acquired Cash. The APA defines the term "Acquired Cash" as meaning all of the Debtors' cash on hand in excess of certain "carve out" cash, but excluding certain restricted cash. In short, Xerxes made it clear in its revised APA that its final bid to purchase of the assets includes the Debtors' Acquired Cash.

Section 7.3(ii), (vii), (viii), and (xii) of the APA requires that the Debtors operate their businesses in the "ordinary course of business" and prohibits the Debtors from prematurely paying down their debt. The Debtors and Xerxes had good reasons for including the Acquired Cash provisions, and the "ordinary course of business" and "no prepayment of debts" covenants in the

APA. Xerxes negotiated to purchase a going-concern business, not a hollow shell business stripped of its working capital. Without Xerxes receiving the Debtors' Acquired Cash, the businesses purchased by Xerxes would have lacked sufficient working capital and cash on hand to continue business operations after the sale closing.

There is no minimum or maximum amount of Acquired Cash specified in the Xerxes revised APA. Xerxes agreed to purchase whatever amount of Acquired Cash that was present in the Debtors' bankruptcy estates on the date of the sale closing. The Debtors agreed to sell Xerxes all accounts receivable and all inventory, whatever amount existed at the time of the closing. The Debtors agreed to operate in the ordinary course of business so that the levels of Acquired Cash (cash on hand) would not be artificially increased or decreased. Xerxes did not agree in the APA that the Debtors could pay off the 2009 DIP Loan with cash on hand prior to closing of the sale to Xerxes.

A.      **Sale Order**

On March 24, 2009, the Bankruptcy Court held a hearing and approved the sale of the Debtors' assets to Xerxes in accordance with the APA. On March 27, 2009, the Bankruptcy Court entered the Sale Order granting the Debtors' motion and approving the sale to Xerxes pursuant to 11 U.S.C. §§ 105, 363, and 365. Black Diamond and BNP approved the form of the Sale Order. Paragraph 32 on page 27 of the Sale Order [Case 1:09-cv-145, Doc. 11-3, p. 28] provides:

> *On the Closing Date,* prior to payment or repayment of any other claims, interests, or obligations of the Debtors (other than the Carve Out Cash Amount), all outstanding Obligations (as defined in the DIP Facility) owed by the Debtors under the DIP Facility (including, without limitation, the fees and expenses of the professionals of the Prepetition Agent and the DIP Agent in accordance with the DIP orders) *will be paid in full and in cash from the proceeds of the sale of the Acquired Assets pursuant to the Agreement.* (Emphasis supplied).

The Xerxes APA and the Sale Order did not require or make any provision for the Debtors to pay off the 2009 DIP Loan with cash on hand prior to the closing of the sale to Xerxes. BNP and Black Diamond did not appeal the March 27, 2009, Sale Order. The Sale Order is a final order of the Bankruptcy Court and it cannot be challenged in the instant appeals.

### B.  DIP Payment Order and Bankruptcy Court's Decision on April 15, 2009

On April 10, 2009, the Debtors made a related motion ("DIP Payment Motion") pursuant to 11 U.S.C. §§ 105, 363, and 364 seeking authorization from the Bankruptcy Court to pay the 2009 DIP Loan from the net sale proceeds as required by the Sale Order. [Case 1:09-cv-145, Doc. 1-70]. Xerxes filed a response in support of the Debtors' DIP Payment Motion. [Case 1:09-cv-145, Doc. 1-71]. Xerxes argued that if the Debtors used the Acquired Cash (cash on hand) to prematurely pay the 2009 DIP Loan in advance of the sale closing, it would rob Xerxes of the Acquired Cash thereby depriving Xerxes of the benefit of its bargain, and it would also violate the express provisions of the Sale Order.

BNP and Black Diamond opposed the DIP Payment Motion and raised the following objections. [Case 1:09-cv-145, Docs. 1-69, 1-72]. BNP and Black Diamond argued that the Debtors have a fiduciary duty to maximize the value of their bankruptcy estates for the benefit of their creditors. It was argued that the Debtors should be required to exhaust a significant amount of "excess" cash on hand to pay off the 2009 DIP Loan prior to the closing of the sale to Xerxes, and only then should the Debtors use the net proceeds derived from the sale of the Debtors' assets to satisfy any remaining obligations under the 2009 DIP Loan.

BNP contended that the Debtors expected to have in excess of $26,900,000 in cash at the sale closing. While the APA defines the term "Acquired Cash," it does not require the transfer of any

minimum amount of cash from the Debtors to Xerxes at the sale closing. BNP, on behalf of the pre-petition lenders, requested that the Bankruptcy Court deny the DIP Payment Motion and order the Debtors to utilize their excess cash to pay off the 2009 DIP Loan prior to the closing of the sale to Xerxes. BNP argued that to do otherwise would give an inappropriate financial windfall to Xerxes and breach the Debtors' fiduciary duty to maximize the amount of funds that the creditors may recover from the bankruptcy estates. [Case 1:09-cv-145, Doc. 1-69, p. 2].

BNP and Black Diamond did not oppose the Debtors paying off the 2009 DIP Loan. BNP and Black Diamond raised objections concerning the source of the funds that should be used to pay the 2009 DIP Loan. BNP and Black Diamond contended that the Debtors should be required to first use existing "excess" cash on hand to pay the 2009 DIP Loan and the loan should not be paid solely out of the net proceeds derived from the sale of the Debtors' assets to Xerxes.

On April 15, 2009, the Bankruptcy Court held an evidentiary hearing and heard oral argument on the Debtors' DIP Payment Motion, along with the objections by Black Diamond and BNP. Bankruptcy Judge John C. Cook made the following oral decision:

> This case is before the Court on the debtors' motion seeking a determi-nation that the outstanding postpetition financing is to be satisfied from the proceeds of the sale of the debtors' assets. The motion is opposed by Black Diamond Capital Management, LLC, which is one of the prepetition secured creditors, and by BNP Paribas, as the administrative agent for the prepetition secured creditor group. They contend that the debtors should satisfy or reduce the DIP loan from cash on hand at the time of the closing of the sale before turning to the sale proceeds. Having considered the evidence and arguments in this case, including the arguments presented by the briefs filed by the parties, the Court now makes its findings and conclusions orally on the record pursuant to Bankruptcy Rule 7052.

> Pursuant to the Final DIP order in this case, the DIP loan is payable at the earlier of April 23, 2009, or the sale of the debtors' assets. The sale was approved by an order entered on March 30, 2009. The question to be decided is what was the deal with respect to cash on hand at the time of

the sale?  Could the debtor take all of the available cash, pay off the DIP loan, and leave the buyer with no cash to operate the business?  Or, did the deal contemplate the buyer acquiring the business along with the available cash still existing at the time of closing of the sale, which cash was generated during the ordinary course of business operations between the approval of the sale and closing of the sale?

The sale order, which was entered on March 30, 2009, addresses how the outstanding obligations, including the DIP loan, is to be paid.  Paragraph 32 on page 27 of the order provides:

"On the Closing Date, prior to payment or repayment of any other claims, interests, or obligations of the Debtors (other than the Carve Out Cash Amount), all outstanding Obligations (as defined in the DIP Facility) owed by the Debtors under the DIP Facility (including, without limitation, the fees and expenses of the professionals of the Prepetition Agent and the DIP Agent in accordance with the DIP orders) will be paid in full and in cash from the proceeds of the sale of the Acquired Assets pursuant to the Agreement."

With respect to the deal itself, and the debtor's accumulated cash, the provisions of the sale order and the Asset Purchase Agreement clearly provide that the debtors' cash on hand at the time of the closing is to be conveyed to the purchaser.  The order defines the term "Acquired Assets" by reference to the Asset Purchase Agreement, and that agreement defines the term by reference to Section 2.1(a) thereof.  Section 2.1(a) specifically includes all Acquired Cash in the list of Acquired Assets.  Acquired Cash is defined as "any Cash of the Company in excess of the Carve-Out Cash Amount, but excluding Cash that is Restricted Cash."  "Restricted Cash" consists of security deposits, funds to pay outstanding checks, and cash of the debtors' foreign subsidiaries.  There is no exception for funds that could otherwise be used to pay down the DIP loan.  Accordingly, the Asset Purchase Agreement is clear that the purchaser is entitled to all of the debtors' cash at closing (with certain limited exceptions).  The Asset Purchase Agreement is, therefore, entirely consistent with the language of the sale order expressly providing that the DIP loan is to be satisfied from the sale proceeds.

In addition, the Asset Purchase Agreement at Section 7.3 requires the debtors to operate in the ordinary course of business between the approval of the sale and closing of the sale and prohibits the debtors from taking any action that could cause a Material Adverse Change in the debtors.  See Section 7.3(i), (ii), and (vii).  "Material Adverse Change" is defined in Section 1.1 of the Asset Purchase Agreement which provides in relevant

part that, "Material Adverse Change ... means any event, change, condition or matter that individually or in the aggregate results in or could reasonably be expected to be materially adverse to or materially impair the revenue or anticipated revenue of the Business or the value of the Acquired Assets or result in a material adverse effect or change in the operation, results of operations, or condition (financial or otherwise) of the Acquired Assets or the Business, taken as a whole ...."

It appears to the Court that the aforesaid provisions were designed to restrict the debtor from operating its going concern business in any manner other than in the ordinary course. The debtors' business was offered for sale as a going concern, not as a business stripped of its working capital. It is true that the Asset Purchase Agreement does not require that a minimum amount of cash be delivered at closing. However, it is clear from the testimony of Jonathan Cleveland that all of the bidding parties submitted their bids based upon acquiring the debtors' available cash at closing, and based upon their assessment of the debtors' cash forecast at the time of the auction. Since the time of the auction, it appears that the debtors' cash has increased approximately $8 million over its cash projections at the auction, but Mr. Cleveland testified that the increase is due more to timing considerations than to an actual, material change in the debtors' cash position because at the same time as cash may have increased, short-term obligations have also increased which will shortly come due after the closing.

Under the Asset Purchase Agreement the debtor was required simply to operate in the ordinary course of business between the time of the approval of the sale and the closing of the sale, and to the extent that operating cash fell somewhat below the projected amounts of cash on hand at closing, the buyer would risk that decline, and to the extent the operating cash somewhat exceeded the projected amounts at closing, the buyer perhaps would benefit. In either event, the debtors' business was sold as a going concern with its operating capital or cash passing to the buyer. Operating in the ordinary course of business did not mean that the debtor could prepay the DIP loan out of its cash before the closing of the sale thereby materially impairing the value of the Acquired Assets which includes Acquired Cash, and the sale order makes clear that the outstanding DIP loan on the closing date was to be paid in full from the proceeds of the sale of the Acquired Assets. That was the deal reached between the parties as set forth in the sale order and Asset Purchase Agreement. If any bidder at the auction had desired to make an offer for the debtor that left the debtors' cash with the debtor rather than as part of the acquired assets, such bidder could have done so. That, however, was not done.

In sum, the Court finds from the documents and proof presented that the

> sale transaction in this case requires that buyer receive at the time of
> closing the acquired cash of the debtors generated through the debtors'
> ordinary course of business, and that the DIP loan as stated in the Sale
> Order is to be paid in full from the proceeds of the sale.
>
> Accordingly, the Court will grant the motion and sign the order ....

[Pages 64-69 of transcript of April 15, 2009 hearing; Case 1:09-cv-145, Doc. 11-5, pp. 65-70].

On April 15, 2009, the Bankruptcy Court entered the DIP Payment Order granting the Debtors' motion seeking authorization to pay and satisfy the 2009 DIP Loan from the net proceeds of the sale of the Debtors' assets to Xerxes. The DIP Payment Order [Case 1:09-cv-145, Doc. 1-79] provides that "from the net proceeds received at the closing of the sale of the Debtors' assets, following delivery of the Acquired Assets to the Purchasers [Xerxes] (as those terms are defined in the Xerxes APA), the Debtors shall pay all obligations under the 2009 DIP Loan in full."

In reliance on the DIP Payment Order entered by the Bankruptcy Court on April 15, 2009, the Debtors paid off the 2009 DIP Loan. The Debtors have been discharged in bankruptcy and do not currently possess any assets. Pursuant to the Bankruptcy Court's orders, the Debtors transferred their assets to Xerxes, including the Acquired Cash. The asset in dispute in these appeals, the Debtors' Acquired Cash at the time of closing of the sale has already been transferred to Purchaser Xerxes and is no longer in the Debtors' possession.

### C.      Stipulation and Agreed Order on April 21, 2009

On April 21, 2009, the Bankruptcy Court entered a stipulation and agreed order ("Stipulation") between the Debtors, BNP in its capacity as administrative agent for the pre-petition lenders, the Official Committee of Unsecured Creditors, and the Debtors' investment advisors, Houlihan, Lokey, Howard & Zukin, Inc. The purpose of the Stipulation [Case 1:09-cv-145, Doc. No. 5-1] was to achieve a negotiated settlement and dismissal of Adversary Bankruptcy Proceeding

11

No. 08-01136 and another bankruptcy appeal styled *The Official Committee of Unsecured Creditors of Propex, Inc. v. Propex, Inc.*, *et al.*, United States District Court for the Eastern District of Tennessee at Chattanooga, Case No. 1:08-cv-238. Xerxes is not a party to the Stipulation.

Paragraph 2 of the Stipulation provides that upon approval by the Bankruptcy Court, BNP and the Committee of Unsecured Creditors agree to the dismissal of the complaint, the appeals, and Adversary Bankruptcy Proceeding No. 08-01136 and any matters related thereto, each with prejudice, subject to the terms of the Stipulation and the allocation described in paragraph 7.

Paragraph 3 of the Stipulation provides that upon approval by the Bankruptcy Court, BNP, the Committee of Unsecured Creditors, and the Debtors agree to the dismissal of the bankruptcy appeal Case No. 1:08-cv-238 in the United States District Court for the Eastern District of Tennessee and any matters related thereto, each with prejudice, subject to the terms of the Stipulation and the allocation described in paragraph 7.

Paragraph 7 of the Stipulation provides:

> In connection with a distribution to the Prepetition Lenders on account of the Prepetition Lender Claims, whether as a result of a sale of substantially all of the Debtors' assets or any portion thereof, through a plan of reorganization, or by any other means, the Prepetition Lenders agree to allow to remain in the [Debtors' Bankruptcy] Estates, free of any lien or claim in favor of the Prepetition Lenders, the amount of (a) $600,000 plus (b) three (3 %) of the net cash proceeds of any such disposition that otherwise would be remitted to the Prepetition Lenders, plus (c) to the extent that there are any funds remaining in the Carve-Out (as defined in the Second DIP Order) after payment of fees and expenses permitted to be paid by the Carve-Out (including, without limitation, the McGee Success Bonus) and fees and expenses incurred by counsel to the Committee in connection with the Complaint and Appeals, such remainder, plus (d) all causes of action of the Estates arising under Chapter 5 of the Bankruptcy Code, including without limitation, sections 510, 542, 543, 544, 545, 546, 547, 548, 549, 550 or 553 of the Bankruptcy Code, plus (e) $500,000, which the parties agree will be used to pay the Houlihan Success Fee Payment and constitutes satisfaction in full of the Houlihan Success Fee Payment; provided,

however, that Houlihan agrees that it will not seek payment on account
of any success fee or any other fee other than the Houlihan Success Fee
Payment, including without limitation, any request for a "substantial contri-
bution" claim pursuant to section 503 of the Bankruptcy Code and hereby
waives any right to any amounts from the Carve-Out; provided further,
however, the Prepetition Lenders agree that they shall not be entitled to a
recovery greater than the amount of the Prepetition Lender Claims.

Paragraph 8 of the Stipulation provides:

After the funds described in paragraph 7 above have been allocated (which
allocation shall occur concurrently with the closing of the Sale [of the
Debtors' assets], including the allocation and distribution of the Carve-Out
in accordance with (a) the terms of paragraph 7, hereof, (b) the Second DIP
Order or any other applicable order of this Court and (c) any applicable
provisions of the Bankruptcy Code, the remaining net proceeds of the Sale
shall be distributed to the Prepetition Lenders immediately following the
closing of the Sale.

Paragraph 9 of the Stipulation provides:

Upon approval of this Stipulation by the Court, the Prepetition Lenders
hereby waive (a) any claims arising from the Adequate Protection Liens
and Adequate Protection Claims (as defined in the First DIP Order) and
(b) any deficiency claim pursuant to § 506(a)(1) resulting from less-than-
full payment of the obligations owed to the Prepetition Lenders.

After entry of the Stipulation and agreed order by the Bankruptcy Court on April 21, 2009,

Appellants BNP and Black Diamond filed their notices of appeal from the DIP Payment Order but

they did not seek a stay of the DIP Payment Order pending appeal under Bankruptcy Rule 8005.

## IV.    Analysis of Motion to Dismiss Appeals

A final order of the Bankruptcy Court may be appealed as a matter of right pursuant to 28

U.S.C. § 158(a)(1).  *Moyer v. Hollinshead (In re Hollinshead)*, 2010 WL 727969, * 1 (6th Cir.

March 3, 2010); *Moyer v. Dutkiewicz (In re Dutkiewicz)*, 408 B.R. 103, 105 (6th Cir. July 6, 2009);

*Official Committees of Unsecured Creditors v. Anderson Senior Living Property, LLC (In re
Nashville Senior Living Property, LLC)*, 407 B.R. 222, 225 (6th Cir. 2009).  On appeal the District

Court may affirm, modify, or reverse a Bankruptcy Court's judgment, order, or decree or remand with instructions for further proceedings. Bankruptcy Rule 8013.

Appellants BNP and Black Diamond contend that they do not seek to reverse or modify the Sale Order. It is argued by BNP and Black Diamond that they bring these appeals to implement and enforce the Sale Order, as they construe and interpret it. BNP and Black Diamond say they seek to ensure that the sale of the Debtors' assets to Xerxes is executed consistent with the terms of the Sale Order and the Debtors' fiduciary duty to accept the highest, best bid at the auction sale.

BNP and Black Diamond want this Court to determine that Xerxes should be ordered to refund Acquired Cash that they contend Xerxes should not have received under the Sale Order. Any Acquired Cash refunded by Xerxes would then be distributed by the Bankruptcy Court to the pre-petition lenders and general unsecured creditors pursuant to the Stipulation and agreed settlement order approved by the Bankruptcy Court on April 21, 2009. [Doc. No. 11, p. 20, BNP's Response to Motion to Dismiss Appeals].

A.      **Stipulation and Waiver**

The Appellees/Debtors (Propex) argue that the appeals should be dismissed as to them (not Xerxes) on the ground that the Stipulation bars BNP and Black Diamond from pursuing any further claims or actions against the Debtors. Based on paragraphs 7, 8, and 9 of the Stipulation, the Debtors contend that the pre-petition lenders, which include BNP and Black Diamond, waived all claims against the Debtors in exchange for certain allocations and distributions of the proceeds derived from the sale of the Debtors' assets. It is argued that as a result of the Stipulation, BNP and Black Diamond have waived and are estopped from making any further claims against the Appellees/Debtors (Propex) and the instant appeals must be dismissed.

The Debtors assert that the Stipulation is designed to leave a specified amount of cash in their estates earmarked for the winding down of the bankruptcy cases and payments to unsecured creditors. Following the sale of the Debtors' assets to Xerxes, the specified amount of cash was all of the cash that remained in the bankruptcy estates. It is argued that the Stipulation provides that the pre-petition lenders waive any and all claims to this remaining cash after the sale to Xerxes. The net sale proceeds were used to satisfy the 2009 DIP Loan and partially repay the pre-petition lenders.

Appellee Xerxes cannot join in and make this same waiver argument because Xerxes is not a party to the Stipulation and agreed order entered by the Bankruptcy Court on April 21, 2009.

In response, BNP and Black Diamond deny that they have waived their right to take the instant appeals from the DIP Payment Order. BNP and Black Diamond contend that they only agreed to waive a certain narrow universe of claims in the Stipulation. Paragraph 9 of the Stipulation provides that the pre-petition lenders waive "(a) any claims arising from the Adequate Protection Liens and Adequate Protection Claims (as defined in the First DIP Order) and (b) any deficiency claim pursuant to § 506(a)(1) resulting from less-than-full payment of the obligations owed to the Prepetition Lenders."

BNP and Black Diamond argue that the instant appeals do not implicate any claims arising from Adequate Protection Liens or Adequate Protection Claims, or a deficiency claim pursuant to 11 U.S.C. § 506(a)(1). By entering into the Stipulation and agreed settlement order, the pre-petition lenders (BNP and Black Diamond) agreed that the only recovery they would receive on account of any of their claims against the Debtors would be 97% of the Sale Proceeds. Thus far, the pre-petition lenders have received 97% of the approximately $52,000,000 distributed to them through the bankruptcy proceeding. If these appeals are successful in recovering a refund of any Acquired

Cash from Xerxes, then the pre-petition lenders would likewise be entitled to recover 97% of any monies that Xerxes is ordered to refund or disgorge. In no event would the pre-petition lenders be entitled to share in the remaining 3% of monies that would be left in the bankruptcy estates for the benefit of other creditors.

In reply, the Debtors maintain that BNP and Black Diamond waived the right to pursue these appeals, at least against the Debtors' remaining assets. BNP and Black Diamond agreed that 3% of the sale proceeds would remain in the bankruptcy estates. Following the sale of the Debtors' assets to Xerxes, this 3% of the sale proceeds comprises virtually all of the Debtors' remaining assets. It is argued that by stipulating that they would not seek this 3% of the sale proceeds, BNP and Black Diamond waived their present claims and are barred from seeking any further recovery against the Debtors through these appeals.

After reviewing the plain language in the Stipulation, the Court agrees with BNP and Black Diamond that they did not in the Stipulation waive their right to take the instant appeals from the DIP Payment Order. In paragraph 9 of the Stipulation, BNP and Black Diamond only agree to waive claims arising from the Adequate Protection Liens and Adequate Protection Claims (as defined in the First DIP Order), and waive any deficiency claim pursuant to 11 U.S.C. § 506(a)(1) resulting from less-than-full payment of the obligations owed to the pre-petition lenders. The waiver argument presented here by the Debtors based on the Stipulation is without merit.

### B. No Viable Claim for Relief on Appeal Against Debtors

These appeals against Appellees/Debtors (Propex) will be dismissed for a different reason. Appellants only seek relief from Purchaser Xerxes. The relief and remedy demanded by the Appellants on appeal is for Xerxes to be ordered to refund or disgorge some of the alleged "excess"

Acquired Cash that Xerxes purchased from the Debtors through the auction sale. As a practical matter, it is unnecessary for the Debtors to be joined and remain as Appellees in these appeals in order for the Appellants to pursue such relief from Xerxes.

The Debtors do not currently possess any assets and have been discharged in bankruptcy. Pursuant to the Bankruptcy Court' s orders, the Debtors have paid off the 2009 DIP Loan and transferred all of their assets to Xerxes. The particular asset in dispute here, the Debtors' Acquired Cash (cash on hand at the time of closing of the sale to Xerxes) has already been transferred to Xerxes and it is no longer in the Debtors' possession. At this juncture Appellants BNP and Black Diamond cannot obtain any relief from the Debtors. The only necessary party Appellee to these consolidated appeals is Purchaser Xerxes.

If we assume *arguendo* that this Court were to determine that Xerxes should be ordered and required to refund a portion of the Acquired Cash, then Xerxes would pay any such funds into the Bankruptcy Court for further administration through the Debtors' bankruptcy estates. Xerxes would not pay such funds back directly to the Debtors.

Accordingly, the motion by Appellees/Debtors (Propex) to dismiss the appeals against them on this ground is well taken and shall be granted.

### C.   Mootness Under 11U.S.C. § 363(m)

The Debtors and Xerxes argue that these appeals should be dismissed pursuant to 11 U.S.C. § 363(m) on the ground of bankruptcy mootness, also commonly referred to as statutory mootness. *Weingarten Nostat, Inc. v. Service Merchandise Co., Inc.*, 396 F.3d 737, 741 (6th Cir. 2005). Appellants BNP and Black Diamond did not appeal and seek a stay pending appeal of the Sale Order entered by the Bankruptcy Court on March 27, 2009. Although BNP and Black Diamond filed

notices of appeal from the DIP Payment Order entered by the Bankruptcy Court on April 15, 2009, BNP and Black Diamond did not seek a stay of the DIP Payment Order under Bankruptcy Rule 8005 pending appeal.

11 U.S.C. § 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

This Court agrees with the Debtors and Xerxes that these appeals must be dismissed as moot pursuant to 11 U.S.C. § 363(m). There is no dispute that Xerxes is a good faith purchaser of the Debtors' assets. The good faith of Xerxes is not challenged.

11 U.S.C. § 363(m) encourages participation in the sale of debtors' assets and increases the value of the property in bankruptcy estates by protecting good faith purchasers from having the bargains they have struck with debtors modified by an appeals court. *Nashville Senior Living Property*, 407 B.R. at 227; *Weingarten*, 396 F.3d at 741-42. 11 U.S.C. § 363(m) protects the reasonable expectations of good faith third-party purchasers by preventing a completed sale of a bankruptcy debtor's assets from being modified or overturned on appeal absent a stay. It safeguards the finality of bankruptcy sales. *Parker v. Goddman (In re Parker)*, 499 F.3d 616, 626 (6th Cir. 2007); *Made in Detroit, Inc. v. Official Committee of Unsecured Creditors (In re Made in Detroit, Inc.)*, 414 F.3d 576, 581 (6th Cir. 2005); *225 Park Plaza Associates, Ltd. Partnership v. Connecticut General Life Ins. Co. (In re 225 Park Plaza Associates, Ltd. Partnership)*, 100 F.3d 1214, 1216 (6th Cir. 1996).

The Sixth Circuit has explained that 11 U.S.C. § 363(m) is a codification of the treatment

of appeals when the appellant either has not obtained a stay of the order or judgment being appealed. *Nashville Senior Living Property*, 407 B.R. at 228. Pursuant to § 363(m) an appeal is moot when the appellant does not obtain a stay from the Bankruptcy Court's order that authorized the sale or lease of the debtor's property. 11 U.S.C. § 363(m) limits an appellate court's review of a consummated sale of the debtor's assets to a good-faith purchaser regardless of the merits of any legal arguments raised against the sale. *Nashville Senior Living Property*, 407 B.R. at 228 n. 8; *Parker*, 499 F.3d at 620-21 (6th Cir. 2007); *Made in Detroit*, 414 F.3d at 581. Bankruptcy mootness under 11U.S.C. § 363(m) is broader than the doctrine of constitutional mootness and § 363(m) applies even though an appellate court could provide a remedy. *Weingarten*, 396 F.3d at 742.

Appellants BNP and Black Diamond say that 11 U.S.C. § 363(m) does not moot these appeals. BNP and Black Diamond argue that § 363(m) by its plain language is not applicable here because they do not challenge the Sale Order entered on March 27, 2009. BNP and Black Diamond contend that they seek to have the Sale Order enforced and implemented, in accordance with their interpretation of the Sale Order and the Xerxes revised APA, by taking an appeal from the DIP Payment Order.

BNP and Black Diamond take the position that at the Sale Hearing on March 24, 2009, the pre-petition lenders and general unsecured creditors believed there would be, at a minimum, $56,000,000 of sale proceeds available to distribute to pre-petition lenders and creditors after the Debtors paid off the 2009 DIP Loan. The pre-petition lenders, including BNP and Black Diamond, did not appeal and seek a stay of the Sale Order. After the time limit for taking an appeal from the Sale Order had expired, it turned out that the expectations of BNP and Black Diamond were not met since there was only approximately $52,000,000 left available after the Bankruptcy Court entered

the DIP Payment Order on April 15, 2009. Purchaser Xerxes' final auction bid was for $82,000,000 and subtracting approximately $30,000,000 to pay of the 2009 DIP Loan leaves a balance of approximately $52,000,000. BNP and Black Diamond contend that the pre-petition lenders and general unsecured creditors received, at a minimum, $4,000,000 less than is required by the Sale Order. BNP and Black Diamond further assert that this $4,000,000 shortfall could even be greater since it does not take into account their contention that the Debtors should have paid down the 2009 DIP Loan below the $26,000,000 mark with "excess cash" that the Debtors had on hand prior to the closing of the sale of the Debtors' assets to Xerxes.

BNP and Black Diamond further argue that the instant case has a unique set of facts and there is no reported precedent where other federal courts have applied 11 U.S.C. § 363(m) in an analogous fact situation. BNP and Black Diamond stress that they are appealing the DIP Payment order and they do not seek to appeal or challenge the Sale Order.

The Appellants' arguments fail. This Court does not agree with the unreasonable interpretation of the Sale Order and the Xerxes revised APA presented by BNP and Black Diamond. Instead, this Court agrees with the Bankruptcy Court's more reasonable, correct construction and enforcement of the Sale Order and the Xerxes revised APA as set forth in the decision rendered by the Bankruptcy Court on April 15, 2009, granting the Debtors' DIP Payment Motion.

Moreover, this Court concludes that the fact situation in this case is governed by and falls within the scope of 11 U.S.C. § 363(m). These appeals by BNP and Black Diamond from the DIP Payment Order are barred as moot under § 363(m). By bringing these appeals, BNP and Black Diamond seek to have this District Court reopen and modify the sale of the Debtors' Acquired Cash to Xerxes that has been approved by the Bankruptcy Court after the sale has been consummated.

The core argument by BNP and Black Diamond is that, prior to the closing of the sale of the Debtors' assets to Xerxes, the Debtors should have paid the 2009 DIP Loan using excess cash on hand which would have left more assets available for distribution to the pre-petition lenders. But if the Debtors' had taken such action, it would have been directly contrary to and a clear violation of the Xerxes APA and the Sale Order. To "enforce" and "implement" the Sale Order in the manner sought by BNP and Black Diamond, this Court on appeal would necessarily have to accept the Appellants' different interpretation of the Sale Order and the APA which is contrary to the Bankruptcy Court's findings and orders.

Although BNP and Black Diamond characterize and portray their appeals as merely an effort to enforce and implement the Sale Order, they actually seek to modify the Sale Order and challenge the completed sale of the Debtors' Acquired Cash to Xerxes which, in the absence of a stay pending appeal, is barred by statutory mootness under 11 U.S.C. § 363(m). These appeals to purportedly "enforce" and "implement" the Sale Order, based on the Appellants' incorrect and unreasonable re-interpretation of the Sale Order and the Xerxes APA, are nothing more than an effort to alter and modify the Sale Order so that BNP and Black Diamond may recover a significant portion of the Debtors' Acquired Cash that was sold to Xerxes pursuant to the Sale Order. The remedy demanded by BNP and Black Diamond is to force Xerxes to refund Acquired Cash that Xerxes purchased from the Debtors. This proposed remedy goes to the very heart of the Sale Order and implicates the mootness provision in 11 U.S.C. § 363(m) that protects good-faith purchaser Xerxes from having the sale modified or reversed on appeal. To avoid the application of 11 U.S.C. § 363(m), BNP and Black Diamond could have sought to obtain a stay of the DIP Payment Order pending appeal but they did not do so.

The Sixth Circuit does not interpret 11 U.S.C. § 363(m) in a narrow manner. *Nashville Senior Living Property*, 407 B.R. at 228-31; *Weingarten*, 396 F.3d 737; *225 Park Plaza Associates*, 100 F.3d at 1217. The Sixth Circuit's opinion in *Weingarten*, 396 F.3d 737, is instructive and provides guidance on the proper scope and application of § 363(m) in cases where a transaction is directly related to or done in furtherance of a sale of the bankruptcy debtor's assets.

The facts in *Weingarten* are as follows. Service Merchandise, Inc. had a lease at a shopping center owned by Weingarten Nostat, Inc. Service Merchandise filed for Chapter 11 bankruptcy and during liquidation of its assets, the Bankruptcy Court pursuant to 11 U.S.C. § 363 approved the sale of Service Merchandise's real property and its right to designate an assignee for its unexpired retail leases to KLA/SM, LLC ("KLA"). There was a designation-of-rights sale agreement between Service Merchandise and KLA. On March 16, 2002, the Bankruptcy Court approved the sale and there was no appeal of the sale order. After the sale, KLA designated JLPK, LLC ("JLPK") as the assignee of Service Merchandise's lease of retail space in the shopping center owned by Weingarten. Service Merchandise notified Weingarten of the proposed assignment of the lease to JLPK, and two simultaneous subleases by JLPK to Bed Bath & Beyond, Inc. and Michaels Stores, Inc. ("Michaels").

Weingarten filed an objection in the Bankruptcy Court to the proposed lease assignment to JLPK and sublease to Michaels. Weingarten argued that the sublease to Michaels failed to meet the requirements of 11 U.S.C. § 365(b)(3). On February 18, 2003, (approximately 11 months after the sale order) the Bankruptcy Court approved the sale and assignment of the lease from KLA to JLPK under 11 U.S.C. §§ 363 and 365(a). Weingarten appealed from the Bankruptcy Court's order approving the lease assignment to JLPK and sublease transaction. Weingarten was unsuccessful in

its efforts to obtain a stay the Bankruptcy Court's order pending appeal.

Two days after the district court denied Weingarten's motion for a stay pending appeal, Service Merchandise assigned the lease to JLPK, and JLPK in turn executed the sublease to Michaels. Michaels took possession of the retail space at the shopping center under the sublease, invested money in reconfiguring it as a Michaels store, and opened for business. Thus, the assignment and sublease transaction was consummated. On appeal, the district court affirmed the Bankruptcy Court's order of February 18, 2003, approving the assignment and sublease to Michaels.

Weingarten took an appeal to the Sixth Circuit Court of Appeals. While Weingarten's appeal was pending in the Sixth Circuit, debtor Service Merchandise moved pursuant to 11 U.S.C. § 363(m) to dismiss the appeal as moot and the Sixth Circuit granted the motion to dismiss. The Sixth Circuit determined that the absence of a stay of the Bankruptcy Court's order required dismissal of the appeal as moot under 11 U.S.C. § 363(m), notwithstanding that § 363(m) applies only to a sale or lease of debtor's property under 11 U.S.C. § 363 and it does not explicitly extend to assignments under 11 U.S.C. § 365, which governs executory contracts and leases in bankruptcy. *Weingarten*, 396 F.3d at 742.

The Sixth Circuit in *Weingarten* reasoned that Service Merchandise sold the right to designate an assignee for its unexpired leases to KLA. KLA's designation of the assignee of the lease (JLPK) was done in furtherance of the transaction for the sale of the debtor's assets that benefitted the bankruptcy estate. *Weingarten*, 396 F.3d at 742-43. Debtor Service Merchandise did not sell the assignment of the lease directly to assignee JLPK. However, the assignment of the lease to JLPK pursuant to the designation-of-rights agreement between Service Merchandise and KLA "constitutes a single transaction if we consider the overall result of the transaction." The Sixth

Circuit determined that if the details of the assignment and sublease transaction are discounted, it is clear that debtor Service Merchandise sold the lease to Michaels pursuant to 11 U.S.C. §§ 363(b) and 365. "The relevant case law demonstrates that a stay pending appeal is required when the sale and assignment are part of a single transaction, and there is no reason that this protection [mootness under 11 U.S.C. § 363(m)] should be lost merely because the transaction has been separated into two steps." *Weingarten*, 396 F.3d at 743.

Applying the *Weingarten* "single-transaction" analysis to the instant appeals, this Court concludes that the Sale Order entered by the Bankruptcy Court on March 27, 2009, approving the sale of the Debtors' assets to Purchaser Xerxes in accordance with the Xerxes revised APA, and the DIP Payment Order entered by the Bankruptcy Court on April 15, 2009, taken together are part of a single sale transaction for purposes of bankruptcy mootness under 11 U.S.C. § 363(m). On April 15, 2009, the Bankruptcy Court rejected and denied the objections of BNP and Black Diamond concerning the source funds that should be used to pay the 2009 DIP Payment Loan pursuant to the Sale Order and the Xerxes revised APA. The DIP Payment Order carries out and puts into effect the Sale Order.

In the wake of *Weingarten* and the other Sixth Circuit precedent cited *supra*, this Court agrees with the Debtors and Xerxes that these consolidated appeals must be dismissed as moot pursuant to 11 U.S.C. § 363(m).

### D.    Equitable Mootness; Collateral Attack on Sale Order and Stipulation

The Debtors and Xerxes next argue that the appeals should be dismissed on the alternative ground of equitable mootness. The doctrine of equitable mootness is discussed by the Sixth Circuit in *Curreys of Nebraska, Inc. v. United Producers, Inc. (In re United Producers, Inc.)*, 526 F.3d 942,

947-52 (6th Cir. 2008); and *Bank of Montreal v. Official Committee of Unsecured Creditors (In re American Homepatient, Inc.*), 420 F.3d 559, 563-65 (6th Cir. 2005). Because this Court has determined that these bankruptcy appeals will be dismissed on the ground of statutory mootness pursuant to 11 U.S.C. § 363(m), it is unnecessary to reach the question whether the equitable mootness doctrine also bars these appeals. *Made in Detroit*, 414 F.3d at 583.

The Debtors and Xerxes further argue that the appeals should be dismissed on the ground that the appeals constitute an impermissible collateral attack on final, non-appealable orders of the Bankruptcy Court, namely the Sale Order and the Stipulation/agreed order. It is unnecessary to reach this question because this Court has determined that the appeals will be dismissed on the ground of statutory mootness pursuant to 11 U.S.C. § 363(m).

### E.    Wayzata DIP Lender Not A Necessary Party to Appeals

The Debtors and Xerxes argue that these appeals should be dismissed on the ground that the Appellants have failed to join a necessary party, the Wayzata DIP Lender on the 2009 DIP Loan that has been repaid by the Debtors. Appellants seek relief from the DIP Payment Order entered by the Bankruptcy Court on April 15, 2009, granting the Debtors' motion to pay off the 2009 DIP Loan with the proceeds derived from the sale of the Debtors' assets to Xerxes. Appellants have not joined the Wayzata DIP Lender on the 2009 DIP Loan as a party to these appeals. It is argued that in the absence of Wayzata DIP Lender, a recipient of a portion of the sale proceeds, this Court cannot fashion a remedy and grant appropriate or complete relief with regard to the DIP Payment Order.

Appellants disagree and respond that they have named all necessary parties. Appellants argue that regardless of what relief they may obtain in these appeals, the Wayzata DIP Lender was always going to be fully repaid on the 2009 DIP Loan. Appellants do not seek to reverse or set aside

the payment of the 2009 DIP Loan. The question presented in these appeals is what is the proper source of funds that the Debtors should have used to repay the Wayzata DIP Lender on the 2009 DIP Loan. Appellants contend that for the Bankruptcy Court's Sale Order to be properly implemented, at a minimum, the Debtors should have used their excess cash-on-hand (Acquired Cash) to ensure that no more than $26,000,000 of the sale proceeds was used to pay the 2009 DIP Loan.

The Court agrees with the Appellants that the Wayzata DIP Lender is not a necessary party to these appeals. To the extent that the Debtors and Xerxes move to dismiss these appeals on the ground that the Appellants have failed to join the Wayzata DIP Lender as a necessary party, the motion to dismiss fails. There is no good reason why the Wayzata DIP Lender should be joined as a party in these appeals. Appellants seek relief only from Purchaser Xerxes. Appellants do not seek to reverse or set aside the payment of the 2009 DIP Loan, and the Appellants do not seek any relief from the Wayzata DIP Lender.

V.    **Bankruptcy Court's Decision Affirmed**

In addition to granting the motion to dismiss the appeals, this Court is of the further opinion that the decision of the Bankruptcy Court on April 15, 2009, and the DIP Payment Order must be affirmed on the merits. The standard of review on appeal is that the Bankruptcy Court's conclusions of law are reviewed *de novo*. *Hollinshead*, 2010 WL 727969, at * 1; *Dutkiewicz*, 2009 WL 1905370, at * 1; *Riverview Trenton R.R. Co. v. DSC, Ltd. (In re DSC, Ltd.)*, 486 F.3d 940, 944 (6th Cir. 2007); *Parker v. Goodman (In re Parker)*, 499 F.3d 616, 620 (6th Cir. 2007); *Nicholson v. Isaacman (In re Isaacman)*, 26 F.3d 629, 631 (6th Cir. 1994).

"Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court

to judge the credibility of the witnesses." Bankruptcy Rule 8013. The Bankruptcy Court's findings of fact must be upheld and cannot be set aside unless the findings are determined to be clearly erroneous. *Parker*, 499 F.3d at 620. A finding of fact is clearly erroneous when although there is evidence to support it, the reviewing court on appeal is left with the definite and firm conviction that a mistake has been committed. *Anderson v. City of Bessemer, N.C.*, 470 U.S. 564, 573 (1985); *Hollinshead*, 2010 WL 727969, at * 1; *Dutkiewicz*, 2009 WL 1905370 at * 1; *DSC, Ltd.*, 486 F.3d at 944.

After reviewing the entire record, this District Court concludes that the Bankruptcy Court's findings of fact are correct and are not clearly erroneous. This Court has reviewed *de novo* the Bankruptcy Court's conclusions of law. This Court agrees with the Bankruptcy Court's conclusions of law. The Bankruptcy Court has not committed an error of fact or law. The decision rendered by the Bankruptcy Court on April 15, 2009, and the DIP Payment Order are **AFFIRMED**.

## VI.    Conclusion

Appellant BNP's motion for oral argument is **DENIED** under Bankruptcy Rule 8012.

The motion by Appellees/Debtors (Propex) and Appellee Xerxes to dismiss these consolidated appeals is **GRANTED**. For the reasons expressed *supra*, the appeals brought by Appellants BNP and Black Diamond are hereby **DISMISSED**. The oral decision rendered by the Bankruptcy Court on April 15, 2009, and the DIP Payment Order entered by the Bankruptcy Court on April 15, 2009, are **AFFIRMED**.

SO ORDERED.
ENTER this the 28th day of April, 2010.

                              */s/ R. Allan Edgar*
                           R. ALLAN EDGAR
                       UNITED STATES DISTRICT JUDGE